UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————————X

RICHARD SPERUGGIA,

        Plaintiff,

    v.                                   **MEMORANDUM & ORDER**
                                             05-CV-3532 (NGG)

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

        Defendant.

————————————————————————X

NICHOLAS G. GARAUFIS, United States District Judge:

    Richard Speruggia ("Plaintiff" or "Speruggia") brings this action for judicial review

pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). Plaintiff challenges

Defendant Commissioner of Social Security Michael J. Astrue's ("Commissioner" or

"Defendant") final determination denying his application for Social Security disability benefits.

The court is presented with the parties' cross-motions on the pleadings pursuant to Fed. R. Civ.

P. 12(c). The issue before the court is whether the Commissioner's decision is supported by

substantial evidence and is based upon correct legal standards. For the reasons set forth below,

Plaintiff's motion is granted to the extent that the case is remanded to the Social Security

Administration for further proceedings consistent with this opinion, and Defendant's motion is

denied.

———————————————

[1] The Complaint named Jo Anne B. Barnhart as Defendant, then the Commissioner of
Social Security. On February 12, 2007, Michael J. Astrue assumed that position. Therefore, he
should be substituted as the named Defendant pursuant to Fed. R. Civ. P. 25(d)(1).

1

## I. Background

### A. Procedural History

Plaintiff filed an application for Social Security disability benefits on April 28, 2003, alleging that an injury to his right hand prevented him from working as an electrician after January 10, 2003. (Transcript of Record ("Tr.") at 44A-C, 45). Plaintiff also sustained injuries to his right knee and to his back while working in November 2001. These injuries were not included in Plaintiff's application and thus were not initially considered by the Social Security Administration ("SSA"). (Id. at 35.) Plaintiff's application was denied on June 8, 2003. (Id. at 32-35.) Plaintiff then requested a hearing, which was held on June 28, 2004 before Administrative Law Judge ("ALJ") Sol Weiselthier ("ALJ Weiselthier"). (Id. at 36-37, 153-82.) After considering evidence pertaining to Plaintiff's injuries to his right hand, his right knee, and his back, ALJ Weiselthier determined on March 10, 2005 that Plaintiff was not eligible for disability benefits.[2] (Id. at 26.) This decision became final on May 26, 2005, when the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Id. at 4-6.)

### B. Plaintiff's Personal and Employment History

Plaintiff was sixty-one years of age at the time of his initial application for Social

---

[2] Although Plaintiff did not file a new Social Security Disability ("SSD") application to include the alleged right knee and back disabilities, the ALJ considered evidence of these injuries. The court has not found caselaw on whether judicial review should extend to disabilities not alleged in the Social Security Disability ("SSD") application but considered by the ALJ, nor have the parties briefed the issue. However, the object of the court's review, as explained infra, is the ALJ's factual findings and decision as finalized by the Appeals Council and the Commissioner. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."). Accordingly, the court considers all alleged disabilities considered by the ALJ.

Security Disability ("SSD") benefits. (Tr. at 44-A.) He went through electrician apprentice training from 1959 to 1965, when he received his electrician journeyman's card. (Id. at 162.) Plaintiff testified at the June 28, 2004 hearing that he had accumulated forty-three years of work service with his union. (Id. at 160-61.) He confirmed to the ALJ that his job as a journeyman electrician did not involve sitting but did entail lifting and carrying heavy items and using pliers. (Id. at 163-66.) Plaintiff stopped working on January 10, 2003, when a 120-pound battery fell on his right hand, his dominant one, and fractured his fifth finger. (Id. at 80.)

### C. Plaintiff's Medical History

#### 1. Right Hand

##### a. Treating Physician

Plaintiff was evaluated in the emergency room on January 10, 2003, was diagnosed with an abrasion and a finger fracture, had his finger placed in a splint, and was advised to follow-up with an orthopedist. (Id. at 80, 143.) He saw Dr. Lawrence Specht ("Dr. Specht") on January 13, 2003 for a follow-up appointment. (Id. at 80.) Examination of the right pinky finger revealed tenderness over the proximal interphalangeal ("PIP") joint but no neurological damage. (Id.) A block-and-closed reduction was performed on the finger, and it was then placed in a splint. (Id. at 81.) Plaintiff told the doctor that even "small angular deformities" would not be acceptable to him given his line of work and the fact that the injury was to his dominant hand. (Id.) Dr. Specht therefore referred Plaintiff to Dr. Walter Rho ("Dr. Rho"), a hand specialist at Orlin & Cohen Orthopedic Associates. (Id.)

Plaintiff initially saw Dr. Rho on January 14, 2003. (Id. at 78-79.) Examination revealed bruising, tenderness and swelling of the middle of the finger and parethesias, or abnormal

neurologic sensations, at the tip of the finger. (Id. at 79.) X-rays revealed a fully displaced

fracture, although Plaintiff was "neurovascularly intact." (Id.) The option of open reduction

internal fixation ("ORIF") surgery was discussed, and Dr. Rho noted that they would proceed

with the surgery at Plaintiff's request. (Id.) Plaintiff underwent the ORIF procedure and, one

week later, on January 23, 2003, Plaintiff saw Dr. Alpesh Shah, of the same medical practice as

Dr. Rho, for a follow-up visit. (Id. at 77.) Examination revealed that pin sites were clean and

dry, that Plaintiff's finger bone had proper alignment, and that the fracture was in acceptable

position. (Id.)

　　　After the surgery, Plaintiff again saw Dr. Rho on February 1, 2003 and February 14,

2003. (Id. at 73-74, 75-76.) Examination revealed that the pin sites were clean and that X-rays

demonstrated satisfactory position of the fracture. (Id.) On February 1, 2003 Plaintiff

complained of moderate pain but reported feeling better on February 14, 2003. (Id.) His finger

was placed in a new fiberglass splint. (Id. at 74.)

　　　On February 28, 2003, Dr. Rho removed the "K-wires" in the pinning, and Plaintiff's

finger was splinted. (Id. at 72.) Dr. Rho advised him to begin occupational therapy. (Id.) The

doctor's impression was that he was doing "nicely." (Id.) During a March 21, 2003 follow-up,

Dr. Rho reported that Plaintiff had a five-degree "extensor lag" in the PIP joint and "lack[ed the]

terminal 1 cm of flexion to the distal palmar crease." (Id. at 71.) No neurological deficits were

observed. (Id.) Although Dr. Rho noted that Plaintiff was improving, he recommended that

Plaintiff continue with "aggressive physical therapy." (Id.)

　　　Dr. Rho's April 11, 2003 examination revealed that Plaintiff still lacked four millimeters

of flexion to the distal palmar crease and had a five-degree flexion contracture of his PIP joint.

4

(Id. at 70.) No neurological deficits were observed. (Id.) Dr. Rho renewed his prescription for pain medication and recommended continued physical therapy. (Id.)

On October 14, 2003, Dr. Rho again examined Plaintiff. (Id. at 104.) Plaintiff complained of pain during gripping and squeezing activities and persistent stiffness. (Id.) Examination revealed stiffness in the fourth and fifth fingers and decreased grip strength. Plaintiff also continued to lack two millimeters of flexion from the fourth and fifth fingers to the distal palmar crease. (Id.) No neurological deficits were noted, but the impression was "fracture with persistent stiffness." (Id.) Physical therapy had not yet been authorized, and, consequently, Dr. Rho recommended and requested authorization for occupational therapy and brace fabrication as needed. (Id.) Dr. Rho stated that Plaintiff "remain[ed] temporarily totally disabled from his work related injury." (Id.)

On November 11, 2003, Dr. Rho maintained that Plaintiff remained temporarily, totally disabled. (Id. at 101.) On examination, it was noted that he had a four-degree flexion contracture of the fourth PIP joint and a three-degree flexion contracture of the fifth PIP joint. (Id.) In addition, Dr. Rho reported that Plaintiff lacked the terminal two degrees of flexion from the fourth and fifth fingers to the distal palmar crease. (Id.) There were no neurological deficits noted. (Id.)

At a December 9, 2003 appointment, Dr. Rho still maintained that Plaintiff remained totally disabled from his work due to pain in his hand that affected his usual gripping activities. (Id. at 99-100.) Plaintiff complained of "continued achiness." (Id. at 99.) Examination revealed a four-degree flexion contracture of the fourth and fifth PIP joints and terminal three degrees of flexion of the same joints. Dr. Rho reported mild loss of motion which resulted in a twenty

5

percent loss of use of the right fifth finger and a fifteen percent loss of the fourth finger. (Id. at 100.) No neurological deficits were noted, and Plaintiff was advised to continue with his home exercises. (Id. at 99-100.)

On February 25, 2004, Dr. Rho again examined Plaintiff, who continued to complain of soreness with prolonged gripping. (Id. at 130.) On examination, it was noted that he lacked the terminal two degrees of flexion of the right fourth and fifth metacarpophalangeal ("MCP") joints and one degree of flexion contracture of the fourth and fifth PIP joints. (Id.) No neurological deficits were noted, and Dr. Rho's impression was "fracture with stiffness." (Id.) Plaintiff saw Dr. Rho again on June 1, 2004, complaining that he had "achiness with strong gripping." (Id. at 124.) Upon examination, Dr. Rho reported full range of motion and flexion, and improved – though incomplete – grip strength. (Id.)

> b.    *Non-Treating Physician and Disability Analyst*

On May 21, 2003, an impartial consultant and orthopedist, Dr. Mohammed Khattak ("Dr. Khattak") examined Plaintiff.[3] (Id. at 82-83.) Plaintiff complained of pain in his right small, ring, and middle fingers and told Dr. Khattak that he was not able to hold objects in his right

---

[3] Subsequent to this court's decision in Lamar v. Barnhart, 373 F. Supp. 2d 169, 176 (E.D.N.Y. 2005), a class-action lawsuit was filed against the Commissioner, alleging that the Social Security Administration had improperly denied benefits to thousands of claimants "on the basis of routinely haphazard, misleading and false consultative examination reports" submitted by Dr. Khattak. Foxworth v. Barnhart, No. 05-CV-3074 (NGG) (Amended Complaint, Docket Entry # 17). In addition, a *qui tam* action is pending before the court alleging that Dr. Khattak conducted improper examinations of applicants for Supplemental Security Income and fraudulently billed the United States for the examinations. See United States ex rel Boxer v. Dr. Mohammed Khattak, No. 06-CV-2116 (NGG). That case was filed in May 2006, and on September 17, 2007, the Government declined to intervene, and the case was unsealed. (September 17, 2007 Docket Entries). Dr. Khattak's role in the instant case, however, as is described more fully infra, was not essential to this Memorandum and Order, as the case is being remanded for other reasons.

hand. (Id. at 83.)

Examination of the right hand revealed normal range of motion of the pinky finger, no intrinsic muscle atrophy, and the ability to make a fist and oppose the thumb to fingers normally. (Id.) Right hand grip strength was graded at four out of five. (Id.) An X-ray of the right hand was reportedly "negative." (Id. at 84.) Examination of the spine and lower extremities was normal. (Id. at 83-84.) Dr. Khattak concluded that Plaintiff had no limitations on his ability to bend, sit, stand, walk, lift, carry, reach or perform gross and fine manipulations with his hands. (Id. at 84.)

Based on the findings of Dr. Rho and Dr. Khattak, J. Battle,[4] a non-examining disability analyst, determined that Plaintiff retained the residual functional capacity ("RFC") to occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, push or pull without limitation, and perform postural and manipulative activities. (Id. at 55, 85-90.)

### 2.    *Right Knee*

On January 9, 2002, Plaintiff sought treatment for persistent pain to his right shin due to falling from a ladder on November 19, 2001. (Id. at 122.) It is unclear what treatment was provided at the time of the injury. (Id.)

On October 16, 2003, Plaintiff saw Dr. Craig Levitz ("Dr. Levitz") and complained of having a "great deal of difficulty with walking and ambulation." (Id. at 102.) Neurological findings in the lower extremities were normal, and a musculoskeletal examination revealed full range of motion in the lower extremities, hips, ankles and left knee. (Id.) As to the right knee,

---

[4] The full name of J. Battle does not appear in the record.

examination revealed tenderness over the medial portion and pain with range of motion. (Id. at 103.) Dr. Levitz also noted that were no gait abnormalities. (Id.) A magnetic resonance imaging ("MRI") demonstrated a medial meniscus tear and osteochondral defect at the right knee. (Id.) After extensive discussion of treatment possibilities, Plaintiff elected to undergo arthroscopic surgery. (Id.)

Dr. Levitz performed the surgery on December 4, 2003 and saw Plaintiff in a post-operative follow-up on January 8, 2004. (Id. at 106-07, 134-35.) Dr. Levitz noted that Plaintiff complained of some soreness but stated that he exhibited full range of motion and showed no instability. (Id. at 134.) Dr. Levitz recommended continued use of Vioxx pain medication and physical therapy. (Id. at 135.) On February 4, 2004, Dr. Levitz examined Plaintiff and noted that despite some recent increased pain, he had been doing "fairly well." (Id. at 132.) Dr. Levitz was not "too concerned" about the pain, and Plaintiff was advised to remain out of work "for at least another month or two." (Id. at 133.)

On February 26, 2004, Dr. Levitz commented that Plaintiff continued to have occasional pain on the inside aspect of his knee where he had Grade IV osteoarthritis. (Id. at 128.) He remarked that Plaintiff was "doing well postoperatively." (Id. at 129.) Plaintiff exhibited full range of motion, a satisfactory gait and no instability. (Id. at 128.)

However on April 19, 2004, Dr. Levitz noted that Plaintiff had a "great deal of pain" with walking. (Id. at 136.) Dr. Levitz also reported a history of Grade IV chondromalacia. (Id.) Dr. Levitz administered Marcaine and Kenalog steroid injections to Plaintiff's right knee. (Id. at 137.) Despite noting satisfactory gait and full stability and range of motion, Dr. Levitz felt that Plaintiff remained "totally disabled from his previous employment." (Id. at 136-37, 141.)

8

On May 17, 2004, Dr. Levitz reported that Plaintiff responded well to the steroid injection and, at the time, had "no pain whatsoever." (Id. at 126-27.) However, Dr. Levitz recommended Supartz injections to prevent further knee pain in the future. (Id. at 127.) Plaintiff continued to have a satisfactory gait and full range of motion in both knees with no instability. (Id. at 126.)

     3.    *Back*

On June 4, 2004, Dr. Sebastian Lattuga ("Dr. Lattuga"), an orthopedic surgeon, examined Plaintiff for back pain. (Id. at 113-14.) Dr. Lattuga described Plaintiff as experiencing chronic thoracic pain, with intrascapular radiation as well as radiation around the flank. (Id. at 113.) Plaintiff stated that the pain was made worse with activity such as lifting, carrying, bending, standing or sitting for long periods of time, and ascending or descending stairs. (Id.) Examination revealed an abnormal gait and review of the spine showed an "obvious kyphotic deformity." (Id. at 114.) Dr. Lattuga observed tenderness and spasms in the lower spine and restricted range of motion of Plaintiff's lumbosacral spine. (Id.) Neurological findings were normal. (Id.) Review of upper and lower extremities revealed normal range of motion and no abnormal findings. (Id.) Dr. Lattuga diagnosed lumbar degenerative disc disease, cervical degenerative disc disease, and thoracic kyphosis. (Id.) Physical therapy and exercise was recommended. (Id.) A June 17, 2004 MRI requested by Dr. Lattuga revealed "marked" increase in usual thoracic kyphosis and multi-level disc degeneration. (Id. at 115.)

In an undated assessment of Plaintiff's ability to perform work-related activities that was mailed to ALJ Wieselthier on July 13, 2004, Dr. Lattuga stated that Plaintiff was able to lift and carry up to ten pounds only occasionally, could stand or walk up to two hours during an eight-hour workday, and could sit for fewer than four hours a day. (Id. at 111-12.) He further

recommended that Plaintiff avoid heights, ladders, kneeling and crawling. (Id.)

### 4. Dr. Kyung Seo

After Plaintiff's additional complaints of right knee and back pain, ALJ Weiseltheir sent Plaintiff for another consultation. Dr. Kyung Seo ("Dr. Seo"), an impartial consultant and orthopedist, examined Plaintiff on August 26, 2004. (Id. at 143-144.) Dr. Seo noted Plaintiff's complaints that his right hand was weakened, causing him difficulty with holding, lifting, and carrying heavy objects, and that his constant pain right knee joint was constantly in pain. (Id. at 143.) On examination, Dr. Seo noted that fine motor activity in both hands was normal but that gripping strength of the right hand was graded four out of five and that the right pinky finger showed a mild flexion contracture at the level of the PIP joint, approximately fifteen degrees. (Id.) Although Dr. Seo found mild paraspinal muscle spasms in the muscles of the lower back, he observed normal curvature of the thoracolumbar spine and normal lumbar lordosis of the lumbrosacral spine. (Id. at 144.) He also noted subcutaneous crepitation in the right knee and a ten-degree genu valum deformity in the right knee with complaint of pain on the medial tibial plateau area. (Id.) Dr. Seo's impression was that Plaintiff had a degenerative osteoarthritis of the right knee with a possible internal derangement of the right knee joint, and a post-fracture status of the right fifth finger. (Id.) Dr. Seo concluded that "due to aching pain of the right fifth finger joint and knee," Plaintiff's ability to sit, stand, walk, bend, lift and carry heavy objects were all "slightly" limited. (Id.) Prognosis was marked as "guarded." (Id.)

On this same date, Dr. Seo also completed an assessment of Plaintiff's ability to do work-related activities. (Id. at 145-48.) Dr. Seo noted that Plaintiff was limited to lifting and carrying twenty-five pounds on occasion and twenty pounds with frequency. (Id. at 145.) Plaintiff's

10

ability to stand and walk was also noted to be limited to two hours in an eight-hour workday. (Id.) Plaintiff's ability to sit was not limited. (Id. at 146) Plaintiff's ability to push and pull was limited in the lower extremities due to arthritis in the right knee. (Id.) Plaintiff could not climb, balance, or stoop, but he was able to kneel, crouch, and crawl on occasion. (Id.) Dr. Seo did not feel that the condition of Plaintiff's right fifth finger was significant. (Id.) Plaintiff's abilities to reach and handle objects, as well as use his fingers, was determined to be unlimited. (Id. at 147.)

### D. Plaintiff's Testimony at the June 28, 2004 Hearing

At the June 28, 2004 hearing, Plaintiff testified that the last three fingers of his right hand were affected by his hand injury and that the fifth finger was the worst because it had the most pain and least mobility. (Id. at 165.) He further stated that he did not have the strength to grasp and close pliers, which he stated were one of the main tools that he used in his job. (Id. at 166.) When asked about how much lifting he does with his right hand, Plaintiff testified that he was no longer working and had been performing tasks such as helping his wife with groceries by using his left hand. (Id. at 164, 168.) Plaintiff stated that he takes Hydrocodone "maybe once a month" for pain. (Id. at 172.)

Regarding his knee, Plaintiff testified that he had a persistent "dull, stabbing pain" on the left side and "a very sharp pain" if he turned too fast or made a sharp turn. (Id. at 171, 172.) Due to knee pain, Plaintiff claimed that he was not able to walk in the mall for more than ten or fifteen minutes. (Id. at 170.) Additionally, Plaintiff claimed that he was not able to stand for more than an hour and that he was unable to kneel. (Id. at 167, 170, 173.) Finally, Plaintiff testified that the steroid injection he received from Dr. Levitz in April 2004 was starting to wear off. (Id. at 171.)

11

Plaintiff testified that he drove daily at least a mile to the store to buy lightweight items such as lottery tickets and that he felt "a certain sideways pressure when [moving] in and out of the car that cause[d him] quite a bit of pain." (Id. at 168, 176-79.) He also stated that he climbed the seven steps to the second floor in his house twice a day but that doing so bothered his knee. (Id. at 157.)

## II. Discussion and Analysis

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (internal citation omitted); see 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 398, 401 (1971) (internal citation omitted). A reviewing court should verify that a claimant "has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (internal quotations and citation omitted). In order to provide a full hearing, an "ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotations and citation omitted).

### B. The ALJ's Decision

To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act. Shaw, 221 F.3d at 131. Agency rules require the Commissioner to apply a five-

step sequential analysis to evaluate whether the claimant is disabled. See 20 C.F.R. §§ 416.920, 404.1520. Under that analysis:

1.   The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).

The ALJ acknowledged the five-step analytical framework in his decision. (Tr. at 16.) He found that Plaintiff met the disability requirement of the first step because Plaintiff was not engaged in gainful activity. (Id. at 25.) Additionally, the ALJ found that Plaintiff's impairments were "severe" within the meaning of step two but that the impairments did not meet one of the step-three enumerated impairments that would result in an automatic finding of disability. (Id. at 17, 25.) See 20 C.F.R. § 404 Subpt. P, App. 1. The impairments recognized by the ALJ were

13

"status post fracture of the right fifth finger and degenerative osteoarthritis of the right knee, possible derangement of the right knee joint and degenerative disc disease." (Tr. at 25.) When considering the fourth step in the analysis, the ALJ concluded that Plaintiff maintained the residual functional capacity to perform the requirements of his past work and accordingly found him not to be disabled. (Id. at 24-25.)

The ALJ found that Plaintiff retained the RFC to perform a "full range of medium work" and, as such, was able to return to his occupation as an electrician, a job that is described in the Dictionary of Occupational Titles ("DOT") and performed in the national economy as "medium work." (Id. at 24.) Thus, the ALJ concluded that Plaintiff could "occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk six hours in an eight-hour day, sit six hours in an eight-hour day, push and/or pull up to fifty pounds, and perform postural and manipulative activities." (Id. at 25.)

In reaching this conclusion, the ALJ discounted, in whole or in part, assessments provided by Plaintiff's treating physicians, Dr. Rho and Dr. Levitz, as well as Dr. Lattuga who examined Plaintiff once for back pain, and Dr. Seo, an independent consultant. (Id. at 23-24.) The ALJ did not give controlling weight to Dr. Rho's opinion that Plaintiff was temporarily and totally disabled. (Id. at 23.) The ALJ found Dr. Rho's opinion to be unsupported by Dr. Rho's own findings, the findings of the impartial consultants, and other evidence such as Plaintiff's "activities of driving." (Id.) The ALJ discounted Dr. Levitz's opinion that Plaintiff had a total disability keeping him from his previous employment because the ALJ found the doctor's findings to be "mainly unremarkable" and contradicted by the impartial consulting physicians' findings. (Id.) Further, the ALJ noted that Plaintiff did not complain of injury to his right knee

14

when filing his initial SSD application in April 2003 and that Plaintiff did not seek treatment for his right knee until October 2003. (Id. at 22.)

Dr. Lattuga's assessment that Plaintiff was extremely limited in his ability to work was similarly discredited by the ALJ because of the doctor's other findings that neurological examinations and review of the upper and lower extremities were normal. (Id. at 24.) The ALJ also pointed out that, despite Dr. Lattuga's notation that Plaintiff had experienced back pain since November 2001, Plaintiff had not alleged back pain nor sought medical treatment for back pain until June 2004. (Id. at 22.) The ALJ also concluded that Dr. Lattuga's findings were contradicted by the other physicians' findings but failed to explain in what way. (Id. at 24.)

Finally, the ALJ discounted Dr. Seo's assessment that Plaintiff could perform only a "limited range of light work" because it was contradicted by the findings in his report that Plaintiff was only "slightly limited" and by Dr. Khattak's findings that Plaintiff was not limited. (Id.) The ALJ further stated that Dr. Seo's assessment was not supported by the treating source but did not elaborate. (Id.) The only assessment not discounted by the ALJ was that of the impartial consultant, Dr. Khattak, who saw Plaintiff in May 2003 and determined that Plaintiff had no limitations. (Id. at 19, 24.)

Additionally, the ALJ found that Plaintiff's allegations and complaints were not credible. (Id. at 23.) In making this credibility determination, the ALJ afforded weight to all the physicians' normal neurological findings as well as Dr. Seo's assessment that Plaintiff was only slightly limited, that Plaintiff retained "substantial" gripping strength, "that there [was] no sensory defect or muscular atrophy of the right hand, and that Plaintiff had "full range of motion of the right knee." (Id.) The ALJ also noted that Plaintiff had no complaints regarding his third

15

and fourth fingers, right knee, and back until after his SSD application was denied in April 2003. (Id. at 22.)

After concluding that Plaintiff could still perform medium work, the ALJ further determined that Plaintiff's past relevant occupation as an electrician was medium work. (Id. at 24.) See 20 C.F.R. § 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."). Accordingly, the ALJ held that Plaintiff's impairments did not prevent him from returning to his past relevant work and thus Plaintiff was not disabled pursuant to step four of the five-step analytical framework. (Tr. at 25.)

### C.  *Treating Physician Rule*

By failing to follow the "Treating Physician Rule," the ALJ applied an erroneous legal standard to his determination of Plaintiff's RFC when he discounted the assessments of Plaintiff's treating physicians. See 20 C.F.R. § 404.1527(d)(2). Pursuant to the "Treating Physician Rule," opinions from treating sources should be given controlling weight unless the opinions are inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); see Schisler v. Sullivan, 3 F.3d 563, 568-69 (2d Cir. 1993) (holding that regulations concerning weight to be given to opinions of treating physicians were binding on the courts and not merely on administrative proceedings). Even when inconsistent with other substantial evidence, the ALJ must consider the following factors in determining the appropriate weight to afford the opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."

Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998). Furthermore, the ALJ must give "good reasons" for not crediting the opinion of a treating physician. Clark v. Comm'n, 143 F.3d 115 (2d Cir. 1998) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Additionally, the ALJ may not substitute his "own assessment of the relative merits of the objective evidence and subjective complaints for that of the treating physician." Garcia v. Barnhart, No. 01-CV-8300 (GEL), 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003).

Other than that provided in the ALJ's findings,[5] there are four explicit RFC assessments present in the record. Dr. Khattak opined that Plaintiff had no limitations on his ability to bend, sit, stand, walk, lift, carry, reach or perform gross and fine manipulations with his hands. (Tr. at 84.) J. Battle, a non-examining disability analyst, assessed Plaintiff's RFC to be medium, prior to Plaintiff's examinations for right knee and back pain.[6] (Id. at 85-90); see 20 C.F.R. § 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."). Dr. Lattuga, after examining Plaintiff once, assessed Plaintiff's RFC as sedentary.[7] (Tr. at 112.) See 20 C.F.R. § 416.967(a)

_____

[5] In finding Plaintiff's RFC to be medium, the ALJ described Plaintiff as being able to occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk six hours in an eight-hour day, sit six hours in an eight-hour day, push or pull up to fifty pounds, and perform postural and manipulative activities. (Tr. 24.)

[6] J. Battle's opinion was that Plaintiff may occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk six hours in an eight-hour day, sit six hours in an eight-hour day, and was not limited in his ability to push and pull. (Tr. 86.) Although this RFC assessment is most similar to the ALJ's, the ALJ was correct not to rely upon it in his determination because "the opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians." Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986).

[7] Dr. Lattuga's opinion was that Plaintiff may occasionally lift or carry ten pounds, but not frequently lift or carry any weight, stand or walk two hours in an eight-hour day, sit four

17

("Sedentary work involves lifting no more than 10 pounds at a time . . . Jobs are sedentary if walking and standing are required occasionally . . . ."). Dr. Seo, an impartial consultant who also examined Plaintiff once, also assessed Plaintiff's RFC as sedentary.[8] (Tr. at 145-46.) See 20 C.F.R. § 416.967(a). In addition to these explicit RFC assessments, Dr. Rho and Dr. Levitz, Plaintiff's treating physicians, opined that Plaintiff was totally disabled from returning to work. (Tr. at 104, 136-37, 141.)

The ALJ erred by discounting the opinions of Drs. Rho, Levitz, and Lattuga and by relying almost exclusively on Dr. Khattak's opinion because he did not apply the above four factors in determining how much weight to credit these inconsistent opinions. See 20 C.F.R. § 404.1527(d)(2). Although Dr. Khattak performed a full examination, he examined Plaintiff prior to Plaintiff's complaints about his right knee and back and did not address either injury in his summary of Plaintiff's "Present Illness." (Tr. at 82.) To the contrary, Dr. Lattuga examined Plaintiff *after* his complaints of all three injuries. (Id. at 113-14, 143-44.) Additionally, Dr. Rho and Dr. Levitz treated Plaintiff more frequently and for a greater length of time than did Dr. Khattak. Drs. Rho and Levitz treated Plaintiff for eighteen months and seven months respectively, while Dr. Khattak examined Plaintiff only once. (Id. at 82-83.) Therefore, the

_____

hours in an eight-hour day, and that Plaintiff was limited in his ability to push and pull. (Tr. 112.)

[8] Dr. Seo's opinion was that Plaintiff may occasionally lift or carry twenty-five pounds, frequently lift or carry twenty pounds, stand or walk two hours in an eight-hour day, and was limited in his ability to push, pull, climb, balance, kneel, crouch, crawl, and stoop, but not in his ability to engage in manipulative activities. (Tr. 145-46.) But for Plaintiff's standing and walking limitation this would have been a light RFC assessment. See 20 C.F.R. § 416.967(b) ("Even though the weight lifted may be very little, a job is [light work] when it requires a good deal of walking or standing . . . .").

nature and extent of Plaintiff's treating physicians' examinations is more thorough than that of Dr. Khattak's examination. See 20 C.F.R. § 404.1527(d)(2).

Likewise, Dr. Khattak's opinion is inconsistent with the totality of the evidence in the record as furnished by the other physicians. See 20 C.F.R. § 404.1527(d)(2); Schisler, 3 F.3d at 568-69. All other examining physicians, including an impartial consultant, assessed at least some diminished RFC. (Tr. at 104, 112, 136-37, 145-46.) Dr. Khattak was the only physician to find Plaintiff to be completely unlimited in any physical activity. (Id. at 82.) Therefore, Dr. Khattak's RFC assessment should have been afforded less weight than the relatively consistent assessments provided by Plaintiff's three treating physicians and Dr. Seo.

The ALJ also failed to follow the so-called "Treating Physician Rule" by discounting the opinions of Plaintiff's treating physicians in favor of "his own assessment of the relative merits of the objective evidence." Garcia, 2003 WL 68040, at *7. The ALJ found that these physicians' findings did not support their assessments of the Plaintiff's capabilities because of a lack of "neurological deficits." (Tr. at 23-24.) However, in their final examinations, each physician presented findings to support his assessments of Plaintiff's RFC. Dr. Rho found Plaintiff to have incomplete grip strength. (Id. at 124.) Dr. Levitz warned that steroid injections might relieve Plaintiff's right knee pain only temporarily. (Id. at 127.) Dr. Lattuga observed tenderness and spasms in the lower spine, restricted range of motion of lumbosacral spine, degenerative disc disease, and an "obvious kyphotic deformity," confirmed by an MRI. (Id. at 114-15.) Notwithstanding the dearth of evidence of Plaintiff's neurological impairment, the ALJ impermissibly placed himself in the physician's role and substituted his own assessment of the physicians' findings in determining Plaintiff's RFC.

19

On remand, the ALJ should determine the Plaintiff's RFC by weighing the 20 C.F.R. § 404.1527(d)(2) factors and by affording greater weight to the opinions of Drs. Rho, Levitz, and Lattuga. When proceeding to step five of the five-step analytical framework, the ALJ should consider that, save for Dr. Khattak, no physician opined that Plaintiff could stand or walk more than two hours each workday, and that this is indicative of a sedentary RFC. See 20 C.F.R. § 404.1567(a) ("Jobs are sedentary if walking and standing are required occasionally"); 20 C.F.R. § 404.1567(b) ("a [light] job . . . requires a good deal of walking or standing"). The ALJ should also refrain from discounting the treating physicians' opinions due to a lack of findings of neurological detriment.

### D. Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to consider properly Plaintiff's subjective complaints of pain. (Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 17.) The court finds that, although the ALJ failed to develop the record as to Plaintiff's inability to grip and close pliers and as to Plaintiff's work history, the record presents substantial evidence in support of the ALJ's determination that Plaintiff was not credible in asserting right hand pain, right knee pain, back pain, and a subsequent loss of mobility as a result of those injuries.

Substantial evidence of subjective pain may be found in "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1529(a)). The ALJ "does not have to accept plaintiff's subjective testimony about her symptoms without question" and should determine a plaintiff's credibility "in light of all the

20

evidence." Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998); Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983). When a plaintiff's claims of pain exceed the support provided by objective medical evidence, the ALJ must examine such factors as the plaintiff's "daily activities." 20 C.F.R. § 404.1529(c)(3)(I). Moreover, the ALJ must consider a plaintiff's prior work record because "good work history may be deemed probative of credibility." Schaal v. Apfel, 134 F.3d 496, 502 (2d. Cir. 1998). Ultimately, however, "it is the function of the [Commissioner], not [the reviewing courts] . . . to appraise the credibility of witnesses, including the [plaintiff]." Aponte v. Sec'y. of Health and Human Serv., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y. of Health and Human Serv., 705 F.2d 638, 642 (2d Cir.1982). Additionally, when addressing a time lapse in treatment, the ALJ should not find adversely if the Plaintiff suffers from a degenerative condition not disabling at the time of initial diagnosis which might later have become disabling. See Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986).

 *1. Right Hand*

  Dr. Khattak's and Dr. Seo's ratings of Plaintiff's gripping strength as four out of five and Dr. Rho's finding that Plaintiff suffered from "incomplete grip strength" indicate a medical basis for Plaintiff's complaints of pain and inability to grasp and close pliers. (Tr. at 83, 124, 143, 166.) However, Dr. Seo, aware of Plaintiff's complaints of gripping pain, opined that Plaintiff was unlimited in manipulative activities. (Id. at 147.) Therefore, other evidence must be explored, such as Plaintiff's continued activity of driving and the timing of Plaintiff's complaints. See 20 C.F.R. § 404.1529; Rivera, 717 F.2d at 724; Kendall, 15 F. Supp. 2d at 267.

  Although the ALJ mentioned Plaintiff's continued activity of driving, the record is not developed as to how Plaintiff gripped the steering wheel, if at all, when driving. (Tr. at 159, 168,

176-79.) Furthermore, the record is silent as to whether the strength required to grip a steering wheel is indicative of the strength required to close a pair of pliers. Id. To determine the strength needed to grip and close a pair of pliers upon various pieces of electrical equipment, the ALJ must further develop the record. See Tejada, 167 F.3d at 774 (holding that an "ALJ, unlike a judge in a trial, must . . . affirmatively develop the record").

Nevertheless, the ALJ made the credibility determination in light of the evidence that Plaintiff did not complain of pain for his third and fourth fingers until after his SSD application had been denied. (Tr. at 22, 104.) Further, Plaintiff did not seek treatment for those fingers despite frequent visits to Dr. Rho preceding the post-denial visit. (Id. at 22, 70-79.) Although neither litigant briefed the issue, the court notes that Plaintiff's right-hand condition was not diagnosed as degenerative. (Id. at 70-79.) The ALJ's credibility determination as to Plaintiff's complaints of pain and inability to grasp and close pliers is based on substantial evidence.

### 2. Right Knee and Back

Dr. Levitz's observation that Plaintiff might require further steroid injections to ease his right knee pain, as well as Dr. Lattuga's and Dr. Seo's findings that Plaintiff suffered a loss of motion and mild back spasms, indicate a medical basis for Plaintiff's complaints of pain and loss of mobility. (Id. at 114, 127, 143.) However, an ALJ need not accept a plaintiff's complaints without question, see Kendall, 15 F. Supp. 2d at 267; Rivera, 717 F.2d at 724, and the ALJ here was correct to examine the record further. The record revealed that, although Plaintiff was injured and initially treated in November 2001, Plaintiff did not seek subsequent treatment for his right knee and back until after the denial of his initial SSD application (Tr. at 22, 102, 113-144, 122.)

In this case, the degenerative nature of Plaintiff's conditions do not explain the lack of treatment from November 2001 until after April 2003. (Id. at 114, 122, 128.) See Bowen, 804 F.2d at 786. Although neither litigant briefed the issue, Plaintiff was not diagnosed as having a degenerative condition in November 2001; it is, therefore, unclear if such a condition existed prior to the diagnosis following the SSD application denial. (Tr. at 114, 122, 128.) Since Plaintiff continued to work without seeking treatment, Plaintiff either let the pain go untreated or the pain did not come back until after the denial of his initial SSD application. Both of these possibilities raised the ALJ's suspicions and therefore, the ALJ relied on substantial evidence in determining that Plaintiff's complaints regarding his right knee and back were not credible. (Tr. At 22.) See Aponte, 728 F.2d at 591.

### 3.   Work history

The ALJ questioned Plaintiff about Plaintiff's lengthy, forty-three year work history; yet, the ALJ did not mention this evidence in determining Plaintiff's credibility. (Tr. at 23, 161.) On remand, the ALJ must consider this evidence, but it should be noted that the ALJ bears the ultimate responsibility for weighing evidence of Plaintiff's credibility and that substantial evidence indicates that Plaintiff is not credible. See Aponte, 728 F.2d at 591.

### E.   Past Relevant Work

Where the ALJ found that Plaintiff's past relevant work was "medium" work, Plaintiff asserts that this categorization understates the demands of his former job as an electrician. (Pl. Mem. at 19). Past relevant work is "either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy." Social Security Ruling 82-62, Titles II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, In General ("SSR

23

82-62"), 1982 WL 31386, at *3 (S.S.A.1982). Determination of the claimant's ability to perform past relevant work:

> requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

Id. Additionally, the ALJ may consult a "vocational expert . . . [for] relevant evidence . . . concerning the physical and mental demands of a claimant's past relevant work." 20 C.F.R. § 404.1560(2).

The ALJ should further develop the record as to Plaintiff's past relevant work. In order to provide a full hearing, an "ALJ must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." Tejada, 167 F.3d at 774 (internal quotations and citation omitted). "[T]he ALJ must make a *specific and substantial inquiry* into the relevant physical and mental demands associated with the claimant's past work." Kerulo v. Apfel, No. 98-CV-7315 (MBM), 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (emphasis added). See also Sivilay v. Apfel, 143 F.3d 1298, 1299 (9th Cir. 1998); Henrie v. United States Dep't of Health and Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993); SSR 82-62, at *3-4. When developing the record in step four of the five-step analytical framework laid out above, "*[d]etailed* information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained [by the ALJ] as appropriate." SSR 82-62, at *3 (emphasis added).

As explained above, the court finds that the record is not fully developed as to how Plaintiff's diminished gripping strength affected his ability to return to work. Plaintiff claimed that he was unable to grip and close pliers and that medical evidence of incomplete gripping strength was present to support this claim. (Tr. at 83, 124, 143, 166, 176-179.) See SSR 82-62, at *3. Although the ALJ referenced the DOT, he did not specify the DOT code number used to determine Plaintiff's past relevant work. (Tr. at 24.) Assuming that Defendant is correct that the ALJ intended to cite to the occupation titled "ELECTRICIAN (construction) alternate titles: wirer," the ALJ still failed to seek out "detailed information" about the manipulative ability needed to perform Plaintiff's past relevant work. (Defendant's Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Mem.") at 25.) United States Department of Labor, Dictionary of Occupational Titles 876 (DOT code no. 824.261-010) (4th ed. 1991); see SSR 82-62, at *3. The record provides no description of the strength required to grip and close a pair of pliers so that the court can make a determination regarding whether steering wheel gripping strength or four-out-of-five gripping strength is sufficient to grip and close pliers. (Tr. at 83, 124, 143, 166.) The incompleteness of the record demands that the ALJ consult a vocational expert regarding the requirements of gripping and closing pliers on a variety of electrical equipment for Plaintiff's job as it is customarily performed throughout the economy. See 20 C.F.R. § 404.1560(2).

Likewise, the ALJ failed to make a "specific and substantial inquiry" into the past work requirements of carrying heavy objects. Kerulo, 1999 WL 813350, at *8. Relying solely on the unspecified entry in the DOT, the ALJ determined that Plaintiff's job as performed in the national economy was medium work, which requires the ability to frequently carry twenty-five

pounds but occasionally to carry no more than fifty pounds at any time. (Tr. at 24.) However, Plaintiff's hand injury occurred while carrying an uninterruptible power supply ("UPS") battery that weighed 120 pounds. (Id. at 80, 143.) The ALJ should have consulted a vocational expert to determine the usual weight of such UPS batteries and the frequency of carrying the batteries as required by Plaintiff's job as it is customarily performed throughout the economy. In sum, the record must bear out the exact DOT code number as well as the ALJ's detailed determination of past relevant work requirements for gripping pliers and carrying heavy objects. Additionally, the ALJ should further develop the record by consulting a vocational expert as to the above issues.

### F.    *Remand or Award of Benefits*

Plaintiff requests that the ALJ's decision be reversed or alternatively remanded for a new hearing and decision. "When the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," reversal of the ALJ's decision and remand solely for the calculation of benefits is appropriate. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). However, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard," a court should remand the case to the Commissioner for the further development of the record. Id. See also Soblewski v. Apfel, 985 F. Supp. 300, 315 (E.D.N.Y. 1997) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.")

In the instant case, the ALJ applied an erroneous legal standard to the weighing of Plaintiff's treating physicians' opinions and failed to develop the record as to Plaintiff's past relevant work. Moreover, the medical record contains conflicting evidence, and "it is for the [Commissioner], and not [a] court, to weigh the conflicting evidence in the record." Schaal v.

Apfel, 134 F.3d 496, 504 (2d Cir. 1998). The court thus denies Plaintiff's request for reversal and an award of benefits and grants Plaintiff a remand for a new hearing and decision.

## III.    Conclusion

For the foregoing reasons, the Commissioner's motion is denied, and Plaintiff's motion is granted to the extent that the case is remanded to the Social Security Administration for further proceedings consistent with this opinion.


SO ORDERED.

s/NGG

Dated: March 24, 2008
       Brooklyn, NY

NICHOLAS G. GARAUFIS)
United States District Judge